IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| STATE OF ALABAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:13-CV-178-WKW |
| | ) | [WO] |
| PCI GAMING AUTHORITY, | ) | |
| BUFORD ROLIN, STEPHANIE | ) | |
| BRYAN, ROBERT McGHEE, | ) | |
| DAVID GEHMAN, ARTHUR | ) | |
| MOTHERSHED, SANDY | ) | |
| HOLLINGER, GARVIS SELLS, | ) | |
| EDDIE TULLIS, KEITH | ) | |
| MARTIN, BRIDGET WASDIN, | ) | |
| MATTHEW MARTIN, BILLY | ) | |
| SMITH, and TIM MANNING, in | ) | |
| their official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

## I. INTRODUCTION

The State of Alabama brings this equity action under state-nuisance law and

the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, 18 U.S.C. §§ 1166–

1168, to prevent allegedly unlawful gaming at three Indian-run casinos in

Alabama:  Creek Casino in Elmore County; Wind Creek Casino in Escambia

County; and Creek Casino in Montgomery County.  Defendants are PCI Gaming

Authority, the commercial entity through which the Poarch Band of Creek Indians

("Poarch Band") operates the casinos, and members of PCI Gaming Authority and of the Poarch Band Tribal Council in their official capacities.

Before the court is Defendants' motion to dismiss for lack of subject-matter jurisdiction and failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(1), (b)(6). The parties have briefed the motion fully and received assistance through briefs filed as *amici curiae* by the United States on behalf of Defendants and the State of Michigan on behalf of the State of Alabama. At the heart of the motion to dismiss is the issue whether the State of Alabama has authority to bring this action for injunctive and declaratory relief to halt allegedly illegal gaming at the Poarch Band's Alabama casinos. The answer requires navigating a complicated jurisdictional and federal statutory maze down pathways implicating tribal sovereign immunity, the *Ex parte Young* doctrine, complete preemption, and congressional intent. Ultimately, each pathway leads to a dead end for the State of Alabama.

Accordingly, after careful consideration of the arguments of counsel, the pertinent law, and the pleadings, as supplemented by the undisputed evidence, the court finds that Defendants' motion to dismiss is due to be granted.

## II.  JURISDICTION AND VENUE

This opinion addresses disputed issues pertaining to subject-matter jurisdiction. Personal jurisdiction and venue are uncontested.

## III.  STANDARDS OF REVIEW

A motion to dismiss based on lack of subject-matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), implicate different, but slightly overlapping, standards of review. Those standards are articulated here, and how these standards apply in this case is set out in Part V.

### A.  <u>Rule 12(b)(1)</u>

A Rule 12(b)(1) motion to dismiss for lack of subject-matter jurisdiction asserts either a facial or factual challenge to the complaint. *McElmurray v. Consol. Gov't of Augusta–Richmond Cnty.*, 501 F.3d 1244, 1251 (11th Cir. 2007) (citing *Williamson v. Tucker*, 645 F.2d 404, 412 (5th Cir. 1981));[1] *accord Lawrence v. Dunbar*, 919 F.2d 1525, 1528–29 (11th Cir. 1990).  A factual attack challenges "the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered."  *Lawrence*, 919 F.2d at 1529 (citation and internal quotation marks omitted).  A facial attack, on the other hand, challenges the complaint on its face and asks whether the complaint "sufficiently allege[s] a basis of subject matter

---

[1] In *Bonner v. City of Prichard*, the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit issued prior to October 1, 1981.  *See* 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).  *Williamson* was decided on May 20, 1981, and, thus, is binding precedent.

jurisdiction," employing a standard similar to that governing Rule 12(b)(6) review. *McElmurray*, 501 F.3d at 1251 (quoting *Lawrence*, 919 F.2d at 1529). Under these review mechanisms, a "'court has the power to dismiss for lack of subject matter jurisdiction on any of three separate bases: (1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Id.* (quoting *Williamson*, 645 F.2d at 413).

**B.   Rule 12(b)(6)**

When evaluating a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court takes the complaint's allegations as true and "construe[s] them in the light most favorable to" the plaintiff. *Resnick v. AvMed, Inc.*, 693 F.3d 1317, 1321–22 (11th Cir. 2012). To survive Rule 12(b)(6) scrutiny, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "[F]acial plausibility" exists "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* In addition to considering the properly pleaded allegations

4

of the complaint, on a motion to dismiss the court can consider "an extrinsic document if it is (1) central to the plaintiff's claim, and (2) its authenticity is not challenged." *Speaker v. U.S. Dep't of Health & Human Servs. Ctrs. for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010) (citation and internal quotation marks omitted).

## IV. BACKGROUND

Since the rise of Indian gaming in the 1970s,[2] there has been an ongoing struggle between the federal government, the states, and Indian tribes over which entity regulates Indian-run gaming and which entity's laws control. That struggle emerges in this case. To place the facts, claims, and arguments in proper context, some background is necessary on the 1988 Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701–2721, 18 U.S.C. §§ 1166–1168 ("IGRA"). Through IGRA, Congress "develop[ed] a comprehensive approach to the controversial subject of regulating tribal gaming [and] struck a careful balance among federal, state, and tribal interests." *Florida v. Seminole Tribe of Fla.*, 181 F.3d 1237, 1247 (11th Cir.

---

[2] The leading treatise on federal Indian law explains that "Indian gaming began to develop as a source for commercial revenue for tribes in the 1970s, primarily as high stakes bingo operations. By 1988, bingo and poker parlors predominated and generated yearly revenues of around $212 million. Today, gaming in Indian country is a multi-billion dollar industry conducted pursuant to [IGRA]." F. Cohen, Handbook of Federal Indian Law § 12.01 (2012 ed.) (hereinafter "Cohen"); *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2211 (2012) (describing Cohen's handbook as "the leading treatise on federal Indian law").

1999).  Part IV begins with a discussion of IGRA, followed by a synopsis of the facts and procedural history of this case.

## A.   **IGRA**

IGRA "provide[s] a statutory basis for the operation and regulation of gaming by Indian tribes." *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 48 (1996).  IGRA was Congress's response to the Supreme Court's holding in *California v. Cabazon*, 480 U.S. 202 (1987). *See* S. Rep. No. 100–446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071. *Cabazon* held that, in the absence of congressional regulation of tribal gaming, Indian tribes could conduct gaming on Indian lands without state interference if the state permitted gaming in any form. *Cabazon*'s holding essentially "left Indian gaming largely unregulated by the states." *Seminole Tribe of Fla. v. Florida*, 11 F.3d 1016, 1019 (11th Cir. 1994), *aff'd*, 517 U.S. 44 (1996).

In 1988, Congress filled the federal regulatory void with IGRA.  IGRA legalizes specified gaming activities on Indian lands but does not give Indian tribes unfettered control over these activities.  IGRA creates three classifications for gaming to which differing jurisdictional and regulatory rules apply.

Class I gaming is subject to the exclusive jurisdiction of the tribes and, thus, is beyond the regulatory reach of both federal and state authorities. *See*

§ 2710(a)(1).[3]  Class I gaming includes "social games solely for prizes of minimal value or traditional forms of Indian gaming engaged in by individuals as a part of, or in connection with, tribal ceremonies or celebrations."  § 2703(6).  This case is not about class I gaming.

Class II gaming, which includes "the game of chance commonly known as bingo," is subject to regulation by the tribes and the National Indian Gaming Commission ("NIGC").[4]  § 2703(7)(A)(i).  States can control class II gaming on Indian lands within their borders only by imposing a statewide ban of all activities that fall within class II gaming.  In other words, class II gaming by Indians is allowed in a state that "permits such gaming for any purpose by any person, organization or entity (and such gaming is not otherwise specifically prohibited on Indian lands by Federal law)."  § 2710(b)(1)(A).  To participate in class II gaming, a tribe also must ratify an ordinance or resolution concerning the conduct of class II gaming, which the NIGC's Chairman then must approve.  § 2710(b)(1)(B).  The merits of this case are about whether Defendants are offering permissible class II or impermissible class III gaming at the Poarch Band casinos.

---

[3] Unless otherwise indicated, all section references are to Chapter 25 of the United States Code.

[4] IGRA created the NIGC, which is a three-member independent agency within the United States Department of Interior.  § 2704.  The NIGC's statutorily stated purpose is to monitor and regulate class II gaming conducted on Indian lands.  *See* § 2706(b).

Class III gaming covers "all forms of gaming that are not class I or class II gaming." § 2703(8). IGRA permits class III gaming, which includes slot machines and casino games, on "Indian lands" as that phrase is defined in IGRA, but only if the gaming is "located in a State that permits such gaming for any purpose by any person, organization, or entity," § 2710(d)(1)(B), and is conducted "in conformance with a Tribal-State compact entered into by the Indian tribe and the State," § 2710(d)(1)(C).[5] IGRA defines "Indian lands" to mean:

(A) all lands within the limits of any Indian reservation; and

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

§ 2703(4). The State of Alabama prohibits class III gaming, and, therefore, under IGRA, the State is not required to negotiate a tribal-state compact that would permit the Poarch Band to engage in class III gaming on Indian lands. But in this lawsuit, the State of Alabama alleges that the Poarch Band casinos offer illegal class III gaming to the public under the guise of class II gaming.

---

[5] In a state that permits class III gaming, IGRA provides a detailed process for the negotiation of tribal-state gaming compacts. *See generally* § 2710(d)(7)(B); *see also Seminole Tribe*, 517 U.S. at 49 (describing § 2710(d)(7)(B)(ii)–(vii) as "an elaborate remedial scheme designed to ensure the formation of a Tribal-State compact"). As part of a tribal-state compact, the tribe and the state can agree to provisions regarding the application of criminal and civil laws, allocation of criminal and civil jurisdiction between the tribe and state, taxation by the tribe, remedies for breach of contract, standards for the operation and maintenance of gaming facilities, and any other subjects that relate directly to the operation of gaming. § 2710(d)(3)(C).

IGRA also includes penal provisions.  *See* 18 U.S.C. §§ 1166–1168.  Section 1166[6] provides that "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but limited to criminal sanctions applicable thereto," apply in "Indian country."[7]  § 1166(a).  For purposes of this provision, the term "gambling" does not include class I or class II gaming regulated by IGRA, or class III gaming conducted under a tribal-state compact approved by the U.S. Secretary of the Interior.  § 1166(c).  Section 1166 applies, therefore, only to class III gaming conducted without the required compact.  The United States has exclusive jurisdiction over criminal prosecutions under this provision.  § 1166(d).

## B.    Facts

Gamblers can play slot machines (and, thus, allegedly engage in class III gaming) within Alabama's borders at Wind Creek Casino in Escambia County, Creek Casino in Elmore County, and Creek Casino in Montgomery County.  These three casinos are the public offerings of the Poarch Band, a federally recognized

---

[6] All references to § 1166 are to Title 18.

[7] "'Indian country,' as used in this chapter means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government . . . ."  18 U.S.C. § 1151.  The United States represents that the "definition of 'Indian county' is broader than IGRA's definition of 'Indian lands,'" and that, therefore, "all lands that are 'Indian lands' meet the definition of 'Indian country.'"  (Doc. # 21, at 3 n.4.) Absent any contrary contention, it is presumed for purposes of this opinion that, if the casinos are on Indian lands, they also are in Indian country.

Indian Tribe in the State of Alabama.[8]  The three casinos are located on lands that, pursuant to 25 U.S.C. § 465, the United States holds in trust for the benefit of the Poarch Band as reflected by deeds executed on November 21, 1984 (Elmore County land), August 17, 1992 (Escambia County land), and March 23, 1995 (Montgomery County land).  (*See* Not. of Removal, Exs. A & B); *see also* 25 C.F.R. §§ 151.1–151.15 (delineating regulations "governing the acquisition of land by the United States in trust status for . . . tribes").  The gaming activities that take place at these casinos are conducted pursuant to a tribal ordinance that has been approved by the Chairman of the NIGC.  (*See NIGC Approval Letter to Poarch Band* (July 30, 2010) (Ex. to Doc. # 21).)

The Poarch Band is not a defendant in this action; however, its wholly owned commercial enterprise, PCI Gaming Authority, is.  PCI Gaming Authority, alongside the thirteen individual Defendants (who are its members and/or members of the Poarch Band Tribal Council), conducts the gaming activities at these three casinos.[9]  The problem with the casinos, as alleged in the operative Complaint, is that Alabama law prohibits most forms of gambling, *see* Ala. Const. Art. IV, § 65, and slot machines in particular, *see* Ala. Code § 13A-12-27, and that class III

---

[8] The Poarch Band received federal recognition in 1984.  *See* 49 Fed. Reg. 24083-01 (June 11, 1984); *see also* 44 U.S.C. § 1507 ("The contents of the Federal Register shall be judicially noticed and without prejudice to any other mode of citation, may be cited volume and page number.").

[9] The individual Defendants are Poarch Band officials and are sued exclusively in their official capacities.

gaming is not allowed in Alabama on Indian lands or elsewhere.  (Am. Compl. ¶¶ 10, 13–18, 24.)   The State of Alabama alleges that, notwithstanding these prohibitions, large-scale illegal class III gaming is occurring at the Indian-run casinos where Defendants are "operat[ing] hundreds of slot machines and other gambling devices in open, continuous, and notorious use." (Am. Compl. ¶ 9.)  The State of Alabama wants to put a stop to the allegedly illegal gaming at these three Indian-run casinos.

The legality of the gaming at the Poarch Band casinos (and other non-Indian venues) is a hotly contested public issue in Alabama and elsewhere.  (*See, e.g.*, Defs.' Mot. to Dismiss 14 n.11 ("The State's case is entirely dependent upon its erroneous allegation that [Poarch Band] is engaged in unlawful class III gaming.").)  However, the issue of the legality of the gaming is for another day. The issue presently is whether, assuming the gaming's illegality, the State of Alabama has authority to bring this action for injunctive and declaratory relief under state and federal law.  The State of Alabama says that it does have such authority, and, thus, it brings a two-count Amended Complaint.

Count One of the Amended Complaint embodies a state-law claim for public nuisance under two alternative theories.  First, it avers that the three Poarch Band casinos in which Defendants allegedly are conducting illegal gaming "are not located on properly recognized 'Indian Lands,'" and that, therefore, IGRA does not

apply and the State has authority to regulate the casinos' gaming activities under state law.  (Am. Compl. ¶¶ 25, 30.)  The thrust of the State's contention that the casinos are not on "Indian lands" is that the Poarch Band was "not under federal jurisdiction and recognized prior to 1934."  (Am. Compl. ¶ 25 (relying on *Carcieri v. Salazar*, 555 U.S. 379 (2009).)  Second, Count One alleges that, if the casinos are on "Indian lands," IGRA (specifically 18 U.S.C. § 1166) incorporates all state laws (both civil and criminal) pertaining to the prohibition of gambling "for purposes of federal law" and gives the State of Alabama authority to enforce the state's public nuisance law as a matter of state law.  Hence, the State of Alabama alleges that whether the casinos are on Indian lands or not, "[t]he continued operation of slot machines and unlawful gambling devices by Defendants is a public nuisance" under Alabama law and that these activities are "enjoinable in suit by the State by virtue of this Court's equity jurisdiction to abate a public nuisance."  (Am. Compl. ¶ 29.)

Count Two alleges a federal-law claim for public nuisance under IGRA and assumes, for its purposes, that the three casinos are located on "Indian lands." (Am. Compl. ¶ 37.)  More specifically, Count Two alleges that Defendants "have no authority to conduct class III gambling under IGRA and that the class III gambling activities are enjoinable under federal law pursuant to 18 U.S.C. § 1166(a) & (c)."  (Am. Compl. ¶ 36.)   It further alleges that the State of Alabama

12

"is a proper party to file an action to enjoin the public nuisance of unlawful gambling on Indian lands."  (Am. Compl. ¶ 37.)

The Amended Complaint requests two forms of equitable relief.  First, it asks for a declaratory judgment that "the gambling activities being conducted by or through the Defendants [are] a public nuisance."  (Am. Compl., at 9.)  Second, it seeks an injunction "permanently enjoining such unlawful gambling activities." (Am. Compl., at 9.)

## C.   The Removal of this Action from State Court

This action commenced in the Circuit Court of Elmore County, Alabama, with the State of Alabama's filing of a one-count complaint for injunctive and declaratory relief on grounds that Defendants' operation of allegedly illegal slot machines at the three Poarch Band casinos constitutes a public nuisance under Alabama law.  Defendants removed this action pursuant to 28 U.S.C. §§ 1331, 1441, and 1442 on three theories:  (1) that IGRA completely preempts the state-law claim in Count One; (2) that the state-law claim raises substantial, actually disputed, federal issues with respect to the status of Indian lands held in trust by the United States and the legality of federally regulated gaming conducted on these lands; and (3) that Defendants' interests in the Indian lands derive from the Secretary of the Interior and call into question the validity of federal laws

pertaining to Indian lands and the lawfulness and regulation of gaming activity on such lands.

The State of Alabama did not challenge the removal, but filed the Amended Complaint to plead alternative state-law theories in Count One – one theory alleging that the casinos are not on "Indian lands" within the meaning of IGRA and the alternative theory alleging that they are.  The State also added the federal-law public nuisance claim under IGRA in Count Two.  Defendants' motion to dismiss and briefing followed, and the court permitted the United States and the State of Michigan to file briefs as *amici curiae*.

## V.  DISCUSSION

Defendants move to dismiss the Amended Complaint under Rule 12(b)(1) and Rule 12(b)(6), and their arguments for dismissal fall into four categories. First, they argue that IGRA completely preempts the state-law public nuisance claim in Count One with respect to the governance of gaming on Indian lands and that, therefore, subject-matter jurisdiction is lacking as to this claim. Second, Defendants contend that as to the state-law claim in Count One pertaining to the governance of gaming on Indian lands and as to the IGRA claim in Count Two, tribal sovereign immunity deprives the court of subject-matter jurisdiction over PCI Gaming Authority and the individual Defendants in their official capacities. Third, Defendants contend that Count One contains an impermissible collateral

challenge to the validity of the deeds evidencing that the United States holds title to the lands at issue in trust for the benefit of the Poarch Band.  Defendants assert, therefore, that the state-law theory in Count One seeking to enjoin allegedly illegal gaming occurring off Indian lands fails to state a claim upon which relief can be granted.  Fourth, Defendants argue that Count Two fails to state a claim upon which relief can be granted because 18 U.S.C. § 1166 does not provide the State of Alabama a right to obtain an injunction against an allegedly public nuisance of unlawful gaming on Indian lands.  The State vigorously opposes each argument.

The discussion proceeds in four parts.  Parts V.A and V.B address the Rule 12(b)(1) issues affecting subject-matter jurisdiction:   complete preemption and tribal sovereign immunity.  Parts V.C and V.D examine the Rule 12(b)(6) issues as to Count One's theory pertaining to the governance of gaming allegedly occurring off Indian lands and as to whether Count Two states a claim for relief.

**A.** **Whether IGRA Completely Preempts the State-Law Nuisance Claim in Count One Concerning the Governance of Gaming on Indian Lands**

Defendants argue that IGRA completely preempts state-law causes of action with respect to the governance of gaming on Indian lands.  Accordingly, Defendants argue that the claim in Count One that alleges a state-law nuisance

theory based on allegedly illegal gaming occurring on Indian lands is subject to IGRA's complete preemptive force.[10]  The court agrees.

"Complete preemption is a narrow exception to the well-pleaded complaint rule and exists where the preemptive force of a federal statute is so extraordinary that it converts an ordinary state law claim into a statutory federal claim."  *Conn. State Dental Ass'n v. Anthem Health Plans*, *Inc.*, 591 F.3d 1337, 1343 (11th Cir. 2009).  In *Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Florida*, 63 F.3d 1030 (11th Cir. 1995) ("*Tamiami I*"), cited by Defendants, the Eleventh Circuit described IGRA as a "comprehensive statute governing the operation of gaming facilities on Indian lands."  *Id.* at 1032; *see also* 25 U.S.C. § 2702(3) (providing that one of the purposes of IGRA is "the establishment of Federal standards for gaming on Indian lands").  *Tamiami I* recited approvingly that "IGRA 'is intended to expressly preempt the field in the governance of gaming activities on Indian lands.'  The occupation of this field by federal law is evidenced by the broad reach of the statute's regulatory and enforcement provisions and is underscored by the comprehensive regulations promulgated under the statute."  *Tamiami I*, 63 F.3d at 1032 (quoting S. Rep. No. 100–446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3076).

---

[10] The alternative theory in Count One that the casinos in which Defendants allegedly are operating illegal gaming off Indian lands is discussed *infra* in Part V.C.

16

Although the Eleventh Circuit in *Tamiami I* did not expressly hold that IGRA is a complete-preemption statute, the Eighth Circuit has so held.  In *Gaming Corporation of America v. Dorsey & Whitney*, 88 F.3d 536 (8th Cir. 1996), the Eighth Circuit addressed as a matter of first impression whether "IGRA completely preempts state laws regulating gaming on Indian lands."  *Id.* at 543.  After a comprehensive analysis of IGRA's text and structure, its legislative history, and its jurisdictional framework, *see id.* at 544–47, the Eighth Circuit concluded that "IGRA has the requisite extraordinary preemptive force necessary to satisfy the complete preemption exception to the well-pleaded complaint rule."  *Id.* at 547.  It reasoned also that its holding was buttressed by the long history of Supreme Court decisions that "illustrate[ ] the importance of the federal and tribal interests in Indian cases and the authority of Congress to protect those interests."  *Id.*  As to what types of claims fall within IGRA's complete preemptive scope, the Eighth Circuit concluded that "[t]he key question is whether a particular claim will interfere with tribal governance of gaming."  *Id.* at 549.  It opined that "[t]hose causes of action which would interfere with the [tribe's] ability to govern gaming should fall within the scope of IGRA's preemption of state law."  *Id.* at 550.  Based upon the Eleventh Circuit's recognition of IGRA's strong preemptive force and the Eighth Circuit's reasoning, which is persuasive, the Eighth Circuit's holding will be applied here.

Accordingly, IGRA completely preempts the state-law claim in Count One if that claim interferes with the Poarch Band's governance of gaming on Indian lands. The court has little difficulty concluding that it does. Count One includes a state-law nuisance claim that seeks to enjoin allegedly illegal gaming occurring on Indian lands. (*See, e.g.*, Am. Compl. ¶ 30 ("Defendants' operation of lotteries and their use of slot machines and unlawful gambling devices are enjoinable in suit by the State by virtue of this Court's equity jurisdiction to abate a public nuisance."); *see also* ¶ 9 ("Defendants operate, administer, and control three casinos on purported Indian lands in Alabama . . . ."); ¶ 11 (alleging that Defendants have "an obligation comply with Alabama's gambling laws" in "Indian country")).) The state-law claim comfortably falls within the preemptive reach of IGRA.

The State of Alabama does not mention the Eleventh Circuit's statements in *Tamiami I* suggesting that IGRA is a complete-preemption statute or the Eighth Circuit's holding in *Gaming Corporation*. The State of Alabama refers, however, on two occasions to IGRA preemption as merely an "affirmative defense." (Doc. # 17, at 9, 36.) But it cites no authority for its contention and devotes no analysis to the issue of complete preemption. For the reasons explained, IGRA carries with

it the requisite complete preemptive force, and, thus, the State's categorization is rejected.[11]

The State of Alabama also does not deny that the state-law claim in Count One seeks to regulate allegedly illegal gaming on Indian lands. Rather, the State argues that IGRA does not preempt the state-law nuisance claim in Count One because 18 U.S.C. § 1166 "expressly provides that tribes must comply with state law with respect to all gambling that is not class I or class II." (Doc. # 17, at 34.) This argument seemingly relinquishes reliance on a purely state-law nuisance claim in favor of a nuisance claim under 18 U.S.C. § 1166, but without explanation of how the argument presents a theory different from that alleged in Count Two. In other words, the State's argument rests on the premise that § 1166 permits it to bring a civil action to enjoin illegal gaming on Indian lands as a state-law public

---

[11] Because complete preemption presents a jurisdictional issue, Rule 12(b)(1)'s standard governs. *See Ammedie v. Sallie Mae, Inc.*, 485 F. App'x 399, 401 (11th Cir. 2012) ("Complete preemption, a jurisdictional doctrine, is distinct from 'defensive,' or 'ordinary,' preemption, which 'allows a defendant to defeat a plaintiff's state-law claim on the merits by asserting the supremacy of federal law as an affirmative defense.'" (quoting *Cmty. State Bank v. Strong*, 651 F.3d 1241, 1261 n.16 (11th Cir. 2011)); *see also Gaming Corp.*, 88 F.3d at 543 ("Complete preemption . . . has jurisdictional consequences that distinguish it from preemption asserted only as a defense. The defense of preemption can prevent a claim from proceeding, but in contrast to complete preemption it does not convert a state claim into a federal claim.").

It is notable also that the State did not contest the jurisdictional basis for the removal, which was predicated in part on IGRA's complete preemptive force, and the findings here demonstrate that the removal of the original one-count, state-law complaint was proper on the basis of complete preemption. *See Behlen v. Merrill Lynch*, 311 F.3d 1087, 1090 (11th Cir. 2002) ("Once an area of state law has been completely pre-empted, any claim purportedly based on that pre-empted state law is considered, from its inception, a federal claim, and therefore arises under federal law.").

19

nuisance. That premise undergirds Count Two and is addressed *infra* in Part V.D. There is no need then to read into Count One a claim that is redundant of Count Two.

In sum, IGRA completely preempts the state-law nuisance theory in Count One that seeks to enjoin Defendants' allegedly illegal gaming on Indian lands. Accordingly, this claim is due to be dismissed for lack of subject-matter jurisdiction on the basis of complete preemption.

**B.  Whether Tribal Sovereign Immunity Bars the Claims Against  PCI Gaming Authority and the Tribal Officials**

Defendants raise a facial challenge to the Amended Complaint's assertion of subject-matter jurisdiction on the basis of tribal sovereign immunity pursuant to Rule 12(b)(1). Accordingly, the allegations of the Amended Complaint are taken as true. *See McElmurray*, 501 F.3d at 1251. Because the parties' immunity arguments differ with respect to PCI Gaming Authority and the tribal officials, the arguments are addressed separately.

**1.  *PCI Gaming Authority***

An Indian tribe, such as the Poarch Band, "is subject to suit only where Congress has authorized the suit" and, thus, has abrogated the tribe's sovereign immunity, or where "the tribe has waived its immunity." *Kiowa Tribe v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1988). The State of Alabama does not contend

20

that the Poarch Band has waived its immunity or that Congress has abrogated it with respect to this state-initiated civil suit. The State hence does not sue the Poarch Band. It sues PCI Gaming Authority, but at the same time concedes that under two Eleventh Circuit decisions, PCI Gaming Authority shares the Poarch Band's immunity. First, in *Freemanville Water System, Inc. v. Poarch Band of Creek Indians*, 563 F.3d 1205 (11th Cir. 2009), the Eleventh Circuit concluded that tribal sovereign immunity barred the plaintiff's action against the Poarch Band and PCI Gaming Authority, which is "wholly owned by the Poarch Band and [is] chartered under its tribal laws." *Id.* at 1207 n.1, 1210. Second, in *Contour Spa at the Hard Rock, Inc. v. Seminole Tribe of Florida*, 692 F.3d 1200 (11th Cir. 2012), the Eleventh Circuit held as a matter of first impression that "the Tribe's removal of the case to federal court did not, standing alone, waive the Tribe's sovereign immunity from suit." *See id.* at 1208. As applied to this case, *Freemanville* establishes that PCI Gaming Authority is immune from suit on the basis of tribal sovereign immunity, and *Contour Spa* confirms that PCI Gaming Authority did not waive its tribal sovereign immunity by removing this case from state court to federal court.

Based upon *Freemanville* and *Contour Spa*, the State agrees that "this Court must dismiss the corporation, PCI Gaming Authority, from this lawsuit" on the basis of tribal sovereign immunity. (Doc. # 17, at 17.) The State maintains,

however, that *Freemanville* and *Contour Spa* were "wrongly decided" and names PCI Gaming Authority only to preserve the issue of tribal sovereign immunity for purposes of appeal.

Bound to follow *Freemanville* and *Contour Spa*, the court finds that PCI Gaming Authority enjoys tribal sovereign immunity in this removed action. Accordingly, PCI Gaming Authority is due to be dismissed on the basis of tribal sovereign immunity for lack of subject-matter jurisdiction.

### 2.    *Tribal Officials*

The thirteen individual Defendants – the tribal officials named in their official capacities – also move for dismissal of Count One and Count Two on the basis of tribal sovereign immunity.[12]  As to Count One, the tribal officials raise tribal sovereign immunity as to the state-law theory that seeks to enjoin the operation of allegedly illegal gaming occurring on Indian lands (*see* Doc. # 14, at 1 (arguing that the State of Alabama's attempt "to use state laws to enjoin federally regulated approved gaming activities on federally held Indian lands" is barred by tribal sovereign immunity).)  The State contends that the tribal officials are not protected by tribal sovereign immunity in their official capacities for declaratory

---

[12] These Defendants are referred to as either the "individual Defendants" or the "tribal officials."  The Amended Complaint alleges and the individual Defendants do not dispute that they took the actions about which the State of Alabama complains in their capacities as Poarch Band officials.  The individual Defendants' status as Poarch Band officials is assumed for purposes of this opinion.

and injunctive relief for ongoing violations of federal law, based upon the *Ex parte Young* doctrine, *see* 209 U.S. 123 (1908), and for violations of state law, based upon grounds that the removal of this action results in a waiver of tribal sovereign immunity.  The State is correct as to Count Two, but not as to Count One.[13]  The analysis begins with Count Two.

### a.   Federal-Law Claim (Count Two)

Since the 1908 decision in *Ex parte Young*, courts have recognized an exception to Eleventh Amendment immunity for lawsuits against state officials for prospective declaratory or injunctive relief to enjoin ongoing violations of federal law.  *See Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1215 (11th Cir. 2009); *see also*, 209 U.S. at 155–56 (holding that Eleventh Amendment immunity was not a bar to a suit against the state's Attorney General to enjoin him from enforcing a state law that allegedly violated the United States Constitution).

In 1978, the Supreme Court suggested that the *Ex parte Young* doctrine extends to the tribal context, *see Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 59 (1978), a suggestion that in 1995, the Eleventh Circuit took as law.  In *Tamiami I*, the Eleventh Circuit addressed a federal-law claim seeking an injunction against tribal officials in their official capacities for allegedly abusing the licensing

---

[13]   As discussed earlier, IGRA completely preempts this state-law claim.  The analysis in this part provides an alternative basis for Rule 12(b)(1) dismissal.

authority conferred upon them by IGRA.  *See* 63 F.3d at 1050.  As to that count, the Eleventh Circuit affirmed the judgment of the district court that the tribal authorities in their official capacities were subject to suit under *Ex parte Young* where the complaint alleged that they had "acted beyond the authority that the Tribe is capable of bestowing upon them under federal laws."  *Id.* at 1045, 1050–51 (citation and internal quotation marks omitted); *see also Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians*, 177 F.3d 1212, 1225 (11th Cir. 1999) ("*Tamiami II*") (citing *Tamiami I* for the proposition that in official-capacity actions for violations of federal law, "tribal officers are protected by tribal sovereign immunity when they act in their official capacity and within the scope of their authority," but "are subject to suit under the doctrine of *Ex parte Young* when they act beyond their authority").

Other circuits, including the District of Columbia, Eighth, Ninth, and Tenth Circuits, similarly have extended the *Ex parte Young* doctrine to tribal sovereign immunity.  *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011) ("Today we join our sister circuits in expressly recognizing *Ex parte Young* as an exception not just to state sovereign immunity but also to tribal sovereign immunity." (citing *Vann v. Kempthorne*, 534 F.3d 741, 749 (D.C. Cir. 2008); *N. States Power Co. v. Prairie Island Mdewakanton Sioux Indian Cmty.*, 991 F.2d 458, 460 (8th Cir. 1993), & *Tamiami II*, 177 F.3d at 1225–26)); *see also*

*Burlington N. & Santa Fe Ry. Co. v. Vaughn*, 509 F.3d 1085, 1092 (9th Cir. 2007)

(The *Ex parte Young* doctrine "has been extended to tribal officials sued in their

official capacity such that tribal sovereign immunity does not bar a suit for

prospective relief against tribal officers allegedly acting in violation of federal

law." (citation and internal quotation marks omitted)); *Davids v. Coyhis*, 869 F.

Supp. 1401, 1410 (E.D. Wis. 1994) (For purposes of *Ex parte Young*, if individual

tribal officials' "actions are in violation of the IGRA, then the defendants have

acted outside the scope of their authority, because tribes are not authorized to

conduct Class II and III gaming in violation of the IGRA's provisions.").   The

rationale is that when tribal officials act in violation of federal law, they are acting

beyond their authority and not on behalf of the tribe and, thus, are amenable to suit

without the protections of tribal sovereign immunity.   *See Ameritech Corp. v.

McCann*, 297 F.3d 582, 586 (7th Cir. 2002) ("[W]hen a state official violates the

Constitution or federal law, he acts outside the scope of his authority and is no

longer entitled to the State's immunity from suit." (citing *Ex parte Young*, 209 U.S.

at 155–56)); *Tamiami I*, 63 F.3d at 1045 (describing *Ex parte Young* as "holding

that a suit against an individual in his official governmental capacity – claiming

that the individual is acting beyond his authority – is not a suit against the

sovereign").   Based upon *Tamiami I*, the *Ex parte Young* inquiry in this case

examines whether the Amended Complaint (1) alleges that the tribal officials are

acting beyond the authority that the Poarch Band is capable of bestowing upon them under IGRA and (2) seeks prospective relief.  The Amended Complaint satisfies these inquiries so that the application of *Ex parte Young* provides a basis for jurisdiction over the official-capacity, state-law claim in Count One with respect to the governance of gaming on Indian lands.

As to the first inquiry, the Amended Complaint alleges that under IGRA the tribal officials do not have lawful authority to conduct class III gaming at the Poarch Band casinos, including "electronic or electromechanical facsimiles of any game of chance or slot machines of any kind," § 2703(7)(B)(ii), because the State of Alabama prohibits class III gaming "as a matter of criminal law and public policy," § 2701(5).[14]   (Am. Compl. ¶¶ 10–12.)   It alleges further that notwithstanding IGRA's prohibitions, Defendants "are engag[ing] in 'class III' gambling" (Am. Compl. ¶ 34) and are operating "hundreds of slot machines and other gambling devices in open, continuous, and notorious use" (Am. Compl. ¶ 9). The Amended Complaint alleges that, as a result, the tribal officials have "exceeded any authority they may have to conduct gambling under . . . federal law."  (Am. Compl. ¶ 3.)  Taken as true, the Amended Complaint's allegations establish that Defendants are acting beyond the scope of their authority in violation

---

[14] The State of Alabama's complete prohibition of class III gaming means that under IGRA, the State of Alabama has no obligation to negotiate a Class III tribal-state compact, and, thus, Defendants cannot offer class III gaming at their casinos.  This much does not appear to be in dispute.

of IGRA.  As to the second inquiry, the State of Alabama seeks an injunction prohibiting the tribal officials from engaging in "unlawful gaming activities" and a corresponding declaratory judgment.   (Am. Compl. 9.)   This type of relief is prospective in nature, and no party contends otherwise.  Based upon the foregoing, the *Ex parte Young* doctrine defeats the tribal officials' assertion of tribal sovereign immunity as to the IGRA official-capacity claims seeking prospective relief in Count Two.

The tribal officials contend in a two-part argument, however, that the Amended Complaint's official-capacity claims do not implicate the *Ex parte Young* doctrine.  The gist of their first argument is that conducting class II gaming at the Poarch Band casinos is within the scope of the tribal officials' lawful authority. (Doc. # 14, at 5.)  That may be, but the Amended Complaint alleges that the gaming actually is impermissible class III gaming.   Whether the gaming occurring at the Poarch Band casinos is class II gaming or unlawful class III gaming goes to the merits of Count Two, not to whether jurisdiction is proper pursuant to *Ex parte Young*.  *See Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 646 (2002) ("[T]he inquiry into whether suit lies under *Ex parte Young* does not include an analysis of the merits of the claim . . . .  An *allegation* of an ongoing violation of federal law . . . is ordinarily sufficient." (citation and

27

internal quotation marks omitted).  The tribal officials' first argument is not persuasive.

In their second argument, the tribal officials contend that for *Ex parte Young* to apply, the Amended Complaint must allege "discrete, individual actions or omissions by the individually named tribal officials" and that the absence of such allegations means that "the suit is really a suit against the tribe itself."  (Doc. # 14, at 5–6 (citing *Imperial Granite Co. v. Pala Band of Mission Indians*, 940 F.2d 1269, 1271 (9th Cir. 1991)).  The State contends that the Eleventh Circuit's decision in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), forecloses this argument, and the court agrees.

The Eleventh Circuit has rejected the contention that "the *Ex parte Young* exception requires that the defendants must have taken some action personally that violates [federal law]."  *Luckey*, 860 F.2d at 1015.  In *Luckey*, the Eleventh Circuit explained:

> Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity.  All that is required is that the official be responsible for the challenged action.  As the *Young* court held, it is sufficient that the state officer sued must, "by virtue of his office, ha[ve] *some connection*" with the unconstitutional act or conduct complained of.  "[W]hether [this connection] arises out of general law, or is specially created by the act itself, is not material so long as it exists."

*Id.* at 1015–16 (quoting *Ex parte Young*, 209 U.S. at 157) (emphasis added).

The Amended Complaint adequately alleges that the individual Defendants have some connection with the alleged ongoing violations of IGRA. It alleges that the tribal officials "operate, administer, and control" the three casinos at which they "operate hundreds of slot machines." (Am. Compl. ¶ 9.) This allegation denoting control reasonably implies that the individual Defendants bear responsibility for the challenged action. In addition, the tribal officials include members of the Tribal Council, which according to the Poarch Band constitution, is the governing body that controls all "tribal assets," "[e]ngage[s] in any business," "make[s] and perform[s] contracts," and "exercise[s] all inherent powers of the Poarch Band . . . not expressly excluded from its authority by the U.S. Congress." Poarch Band's Const., art. IV, §§ 3 & 4; *see also* 25 U.S.C. § 476 (providing authority for an Indian tribe to adopt a constitution). Based upon the foregoing, the tribal officials are appropriate officials "against whom prospective relief could be ordered." *Luckey*, 860 F.3d at 1016.[15] Defendants' second argument against application of *Ex parte Young* also is not persuasive.

---

[15] Given the standards pronounced in *Luckey*, which is binding authority, the court need not decide whether the Ninth Circuit's decision in *Imperial*, upon which the tribal officials rely, requires something more for a plaintiff to overcome a tribal official's tribal sovereign immunity under the *Ex parte Young* doctrine. *But see Comstock Oil & Gas Inc. v. Ala. & Coushatta Indian Tribes of Tex.*, 261 F.3d 567, 570 (5th Cir. 2001) (observing that the "sundry cases that the tribal council members cite from other circuits to buttress their immunity claim [including *Imperial*], based on their allegedly having been acting within the scope of their authority, are unpersuasive and irrelevant").

In sum, the federal-law claim in Count Two falls within the *Ex parte Young* exception, and the tribal officials are not protected by tribal sovereign immunity. Subject-matter jurisdiction exists, therefore, as to Count Two.  This jurisdictional finding does not mean, however, that there is a cause of action available to the State of Alabama under IGRA.  As discussed *infra* in Part V.D, Congress has not conferred upon the State the right to bring this action under 18 U.S.C. § 1166 for injunctive and declaratory relief to enjoin allegedly illegal gaming at the Poarch Band's Alabama casinos.  Ultimately then, the claim in Count Two cannot survive under Rule 12(b)(6).  *See Tamiami I*, 63 F.3d at 1047 ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction." (citation and internal quotation marks omitted)).

### b.    State-Law Claim (Count One)

The tribal officials contend that the *Ex parte Young* doctrine does not apply to the official-capacity claim in Count One with respect to the governance of gaming on Indian lands.  They argue that under Count One, any injunction to abate the alleged public nuisance rests on an alleged violation of state law, not federal law as required for the application of the *Ex parte Young* doctrine.  The tribal officials cite *National Association of Boards of Pharmacy v. Board of Regents of the University System of Georgia*, 633 F.3d 1297 (11th Cir. 2011), involving a state

official's assertion of sovereign immunity, in which the Eleventh Circuit noted that the *Ex parte Young* doctrine did not apply to the counts in the complaint that alleged state-law claims.  *See id.* at 1305 n.15 (observing that "Counts II and III were state law claims as to which *Ex parte Young* did not apply").  Accordingly, Defendants contend that the state-law claim in Count One must be dismissed for lack of subject-matter jurisdiction on the basis of tribal sovereign immunity.

The State of Alabama cites no decision in which a court has applied *Ex parte Young* to enjoin a tribal official in his or her official capacity from committing an ongoing violation of state law, and the court's independent research uncovered no such decision.[16]  The court need not resolve this issue, however, because the State of Alabama does not press the application of the *Ex parte Young* doctrine.  (*See* Doc. # 17, at 20 n.6 (acknowledging that "*Ex parte Young* applies by its terms to suits alleging ongoing violations of federal law, and Count 1 by its terms asserts claims that are based on state law").)  Rather, the State offers two other reasons for

---

[16] There is some authority indicating the contrary.  In *Frazier v. Turning Stone Casino*, 254 F. Supp. 2d 295 (N.D.N.Y. 2003), the court found that "[a]lthough *Ex Parte Young* offers a limited exception to the general principle of state sovereign immunity and has been extended to tribal officials acting in their official capacities, it only allows an official acting in his official capacity to be sued in a federal forum to enjoin conduct that violates federal law."  *Id.* at 310. The district court found that, because the plaintiff brought only state-law claims, the *Ex parte Young* doctrine could not be used to strip the tribal officials of tribal sovereign immunity.  *See id.*; *see also N. Arapaho Tribe v. Harnsberger*, 697 F.3d 1272, 1282 (10th Cir. 2012) (observing that, although in the Tenth Circuit *Ex parte Young*'s exception to sovereign immunity applied in the tribal immunity context, the doctrine was "simply not applicable" in a suit that did not allege that the tribal officials "violated federal law").

its contention that tribal sovereign immunity does not bar the state-law claim in Count One.  (Doc. # 17, at 20 n.6.)  Each argument is addressed in turn.

First, the State argues that § 1166 "incorporates" Alabama's public nuisance law "as 'a matter of federal law,'" and, therefore, "the claims asserted in Count One are federal in nature and thus fall squarely within the *Ex parte Young* exception."  (Doc. # 17, at 20 n.6 (quoting 18 U.S.C. § 1166(a).)  This argument again conflates Count One's state-law nuisance claim with Count Two's federal-law nuisance claim under § 1166, and, therefore, a separate analysis is not required here.  As discussed in a preceding subsection, the *Ex parte Young* exception to tribal sovereign immunity provides a jurisdictional basis upon which the official-capacity claim in Count Two can proceed against the tribal officials.

Second, the State of Alabama contends that, even if the claim in Count One is "solely a state-law claim," Count One is not barred by tribal sovereign immunity with respect to the tribal officials.  The State argues that it had a right of action in state court to proceed against the tribal officials "under Alabama's equivalent of *Ex parte Young*" based upon the principle that "governmental immunity does not extend to a plaintiff's suit seeking a declaratory judgment about the meaning of state law."  (Doc. # 17, at 20 n.6 (citing *Ala. Dep't of Transp. v. Harbert Int'l, Inc.*, 990 So. 2d 831 (Ala. 2008), *abrogated on other grounds by Ex parte Moulton*, 116 So. 3d 1119 (Ala. 2013)).)  The State further asserts that, when "governmental

32

officers remove a case from state court (where they would have no sovereign immunity) to a federal court, they waive any immunity they otherwise would have had in federal court but for the removal."  (Doc. # 17, at 20 (citing *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002).)  The State argues that, based upon the rationale of *Lapides*, tribal officials "cannot obtain a strategic advantage with respect to state-law claims for injunctive relief under Alabama's equivalent of *Ex parte Young* – to which defendants would be subject in state court – by removing those claims to federal court."  (Doc. # 17, at 20 n.6.)

*Harbert* is an Alabama Supreme Court decision addressing a state officer's immunity for state-law claims under a provision of the Alabama constitution.  It has nothing to do with a tribal official's entitlement to tribal sovereign immunity.  Tribal sovereign immunity has its own unique history, and its origins do not derive from a state's immunity laws.  *See generally Kiowa Tribe*, 523 U.S. at 755–58 (discussing history of tribal sovereign immunity).  Moreover, "'tribal immunity is a matter of federal law,'" not state constitutional law, and "'is not subject to diminution by the States.'"  *Contour Spa*, 692 F.3d at 1206 (quoting *Kiowa Tribe*, 523 U.S. at 756); *accord Furry v. Miccosukee Tribe of Indians of Fla.*, 685 F.3d 1224, 1228 (11th Cir. 2012).  The State has not demonstrated how *Harbert* – which addressed a wholly different source of immunity under state law – assists in the

analysis of whether the tribal officials here have tribal sovereign immunity as a matter of federal law.

Moreover, the Eleventh Circuit has declined to extend *Lapides*'s holding – *i.e.,* that the state's removal of a state-law action from state court to federal court constitutes a waiver of Eleventh Amendment immunity – in the tribal immunity context and has concluded that a tribe does not waive its tribal sovereign immunity from suit by removing it to federal court.  *See Contour Spa*, 692 F.3d at 1208. *Lapides*, when read in conjunction with *Contour Spa*, does not support the proposition that the tribal officials' removal of this action prevents them from relying on tribal sovereign immunity in this federal forum.

In sum, none of the arguments the State asserts overcomes Defendants' assertion of tribal sovereign immunity as to the official-capacity, state-law claim in Count One with respect to the governance of gaming on Indian lands. Accordingly, even if IGRA did not completely preempt Count One's claim that seeks injunctive and declaratory relief against the tribal officials in their official capacities for violations of state law with respect to the gaming on Indian lands, *see supra* Part V.A, that claim is subject to dismissal on the alternative basis of tribal sovereign immunity for lack of subject-matter jurisdiction.

C.      **Whether the State-Law Nuisance Claim in Count One Concerning the Governance of Gaming on Non-Indian Lands States a Claim for Relief**

The analysis turns to Defendants' Rule 12(b)(6) challenge to the theory in Count One that the State has authority to bring Count One to enforce its public-nuisance laws against the allegedly illegal gaming occurring at the Poarch Band casinos because the casinos are not on "Indian lands" within the meaning of IGRA. (Am. Compl. ¶ 25 (citing *Carcieri*, 555 U.S. at 379); *see also* Doc. # 31, at 12 (describing Count One as also embodying "a state-law public-nuisance claim about gambling that is alleged to be occurring off properly recognized Indian lands").) According to the State, in light of *Carcieri*'s holding, the Secretary of the Interior "had no authority under [25 U.S.C. § 465] to take the Poarch Band's landholdings into trust." (Doc. # 17, at 35.)  The State's theory takes the gaming activities off Indian lands and, thus, out of IGRA's regulatory and preemptive reach.  (*See* Doc. # 17, at 34 (arguing that "IGRA governs gambling only if that gambling is conducted on 'Indian lands'").)  Because the parties disagree as to the effect of *Carcieri* on the validity of the 1984, 1992, and 1995 deeds by which the United States took the lands at issue in trust for the benefit of the Poarch Band, the analysis appropriately begins with an examination of the *Carcieri* decision.[17]

---

[17] The State does not dispute the authenticity of the deeds reflecting that the United States holds the lands at issue in trust for the benefit of the Poarch Band.  It also does not dispute that the Secretary of Interior "has purported to take certain lands into trust on the [Poarch Band's]

1. ***The* Carcieri *Decision***

In *Carcieri*, a case brought under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–06,[18] the Supreme Court construed the definition of "Indian" in the Indian Reorganization Act ("IRA"). The IRA, enacted in 1934, authorizes the Secretary of the Interior "to acquire land and hold it in trust 'for the purpose of providing land for Indians.'" 555 U.S. at 381 (quoting 25 U.S.C. § 465). The IRA defines "[t]he term 'Indian' as used in this Act [to] include all persons of Indian descent who are members of any recognized Indian tribe now under Federal jurisdiction . . . ." 25 U.S.C. § 479. Concluding that § 479's text was plain and unambiguous, the Supreme Court held that "the phrase 'now under Federal jurisdiction' refers to a tribe that was under federal jurisdiction at the time of the [IRA's] enactment," 555 U.S. at 382, rather than at the time the Secretary took the lands into trust. "As a result, § 479 limits the Secretary's authority to

---

behalf in the years since 1984." (Doc. # 17, at 35.) Although the deeds are extrinsic to the Amended Complaint, they are proper for consideration under Rule 12(b)(6) because the deeds are central to the State of Alabama's alternative theory that the casinos are not on Indian lands and the State does not challenge the deeds' authenticity. *See Speaker*, 623 F.3d at 1379; *see also Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1229 n.2 (10th Cir. 2010) (taking judicial notice under Fed. R. Evid. 201(d) of deeds placing lands into trust).

[18] The APA entitles "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, to judicial review thereof." 5 U.S.C. § 702. A court presented with an APA claim "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [or] in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706.

taking land into trust for the purpose of providing land to members of a tribe that was under federal jurisdiction when the IRA was enacted in June 1934." *Id.*

Applying these principles, the Supreme Court held that the Secretary lacked authority to take the land into trust because the Narragansett Tribe did not achieve federal recognition until 1983. The tribe did not argue that it otherwise was "under federal jurisdiction" as of 1934, and the evidence indicated the contrary; thus, the Supreme Court did not have to analyze what sort of evidence might support a claim that a tribe was "under federal jurisdiction" in 1934. Justice Breyer noted in his concurrence, however, that a tribe might be under federal jurisdiction in 1934 without having been formally recognized. *See Carcieri*, 555 U.S. at 397 (Breyer, J., concurring) (The "interpretation that reads 'now' as meaning 'in 1934' may prove somewhat less restrictive than it at first appears" because "a tribe may have been 'under Federal jurisdiction' in 1934 even though the Federal Government did not believe so at the time."). As a consequence of the Supreme Court's ruling, the Narragansett Tribe lost the benefits of the IRA.

*Carcieri*'s bottom line is that the Secretary of the Interior does not have authority to acquire land in trust for tribes that were not under federal jurisdiction in 1934. The meaning of the phrase "under federal jurisdiction" has not been sifted by the courts; however, in light of the *Carcieri* decision, the Secretary has

established a two-part test for assessing whether a tribe was "under federal jurisdiction in 1934."[19]   (*See* Doc. # 41 at 4 n.2.)

The State argues that because the United States did not recognize the Poarch Band as a tribe until 1984, it is "50 years too late for the Secretary to be able to take land into trust on the [Poarch Band's] behalf."  (Doc. # 17, at 34.)  It is not necessary to opine as to whether the State's application of the *Carcieri* holding is correct.  Even if *Carcieri* casts a cloud over the validity of the land-into-trust deeds, which the parties do not dispute were approved by the Secretary of the Interior decades ago, *Carcieri* is distinguishable from this action on two important grounds.  First, *Carcieri* involved a timely direct challenge to a land-into-trust decision under the APA.  The APA indisputably provides a proper framework for challenging the Secretary's land-into-trust decisions.  *See Carcieri*, 555 U.S. at 385; *see also Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2208 (2012) (observing that a challenge to the

---

[19] Defendants represent that the Secretary's current position on the meaning of the phrase "under federal jurisdiction" is set out in a January 24, 2014 determination letter accepting land into trust for the Mechoopda Indian Tribe of Chico Rancheria.  (*See* Doc. # 41, at 4 n.2.)  The first prong of the test "examines whether there is a sufficient showing in the tribe's history, at or before 1934, that it was under Federal jurisdiction, *i.e.*, whether the United States had, in 1934 or at some point in the tribe's history prior to 1934, taken an action or series of actions – through a course of dealings or other relevant acts for or on behalf of the tribe or in some instances tribal members – that are sufficient to establish or that generally reflect Federal obligations, duties, responsibility for or authority over the tribe by the Federal Government.  The second prong looks at "whether the tribe's jurisdictional status remained intact in 1934."  (Jan. 2014 Sec'y's Letter 30 (Ex. to Doc. # 41).)

Secretary's decision to take land into trust is a garden-variety APA claim); *Kansas v. United States*, 249 F.3d 1213, 1222–23 (10th Cir. 2001) (analyzing under the APA, a challenge to the NIGC's decision to issue a tribe a permit for class II gaming on "Indian lands," and, in particular, to the NIGC's Indian-lands determination).  Second, the Secretary of the Interior was the defendant and, thus, was in a position to defend his decision.  The Supreme Court did not have to decide whether an action challenging the Secretary's decision to take lands into trust on behalf of the Poarch Band can proceed without the Secretary.  This action is quite different.

Here, the State does not challenge the United States's land-into-trust decisions under the APA's framework; the Secretary is not a defendant; and the attack on the validity of the land-into-trust decisions comes decades after the expiration of the APA's six-year statute of limitations, *see* 28 U.S.C. § 2401(a). The State asserts, however, that it does not have to proceed under the APA because this action "does not seek to unwind the decisions of the Secretary of the Interior" (Doc. # 31, at 7), but rather seeks an injunction against "the officers of an Indian tribe from operating an open and notorious [state-law] public nuisance."  (Doc. # 31, at 7.)  But this argument ignores that the very reason the State says it can bring a state-law nuisance claim in Count One for allegedly illegal gaming occurring off Indian lands is because under the 2009 *Carcieri* decision, the

39

Secretary lacked authority to take the lands upon which the casinos now stand in trust for the benefit of the Poarch Band.  Because *Carcieri* involved a timely APA action, the State cannot rely on *Carcieri* as grounds for circumventing the APA. *Cf. City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, 702 F.3d 1147, 1153 (8th Cir. 2013) (refusing to rule on the validity of the NIGC's decision because "such challenges are properly made under the [APA]," and "[t]he NIGC [was] not a party . . . , and the City ha[d] not made a showing that the review process established by Congress in the APA might be circumvented here").  The State cannot avoid the APA's procedures for reviewing the Secretary's decisions simply by reformulating its argument.[20]  Based on the foregoing, the court rejects

---

[20] As noted by the United States (Doc. # 21, at 6 n.6), there is another case pending in this district in which the Muscogee Creek Nation, joined by other plaintiffs, has brought an APA challenge to the Secretary of the Interior's decision to acquire one of the parcels the United States holds in trust for the Poarch Band in Elmore County.  *See Muscogee Creek Nation v. Poarch Band of Creek Indians*, No. 2:12cv1079-MHT (M.D. Ala. filed Dec. 12, 2012).  Motions to dismiss are pending in that case.

The State of Alabama also points out that in the United States District Court for the Western District of Michigan, the State of Michigan has brought a state-law claim against tribal officials in their official capacities, alleging that the tribal officials are illegally operating class III gaming at a casino *off Indian lands* and that continued operation of that casino is a public nuisance under Michigan state law.  *Michigan v. Bay Mills Indian Cmty.*, No. 1:10cv1273, 1:10cv1278 (W.D. Mich. Aug. 9, 2011) (Am. Compl.).  The State of Michigan added the state-law nuisance claim against the Bay Mills tribal officials during the pendency of the appeal from the district court's order granting preliminary injunctive relief.  In its opinion vacating that injunction, the Sixth Circuit "express[ed] no opinion as to whether, or under what circumstances, those officers may be sued."  *Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 416 (6th Cir. 2012).  Unlike this case, it was undisputed in *Bay Mills* that the property at issue had not been acquired by the United States in trust for the benefit of the Bay Mills tribe.  *See id.* at 413

the State's *Carcieri*-based collateral challenge in Count One to the Secretary's decades-old land-into-trust decisions.   For purposes of this lawsuit, the fact remains, as established by the 1984, 1992, and 1995 deeds, that the United States holds title to the lands in question in trust for the benefit of the Poarch Band.[21]

This does not end the analysis, however.  After the close of briefing on the motion to dismiss, the State notified the court of the recent split panel decision in *Big Lagoon Rancheria v. California*, 741 F.3d 1032 (9th Cir. 2014).  The State argues that *Big Lagoon* supports its position, but the court finds *Big Lagoon*'s analysis to be unpersuasive.

### 2.    *The* Big Lagoon *Decision*

In *Big Lagoon*, the Ninth Circuit applied the *Carcieri* holding in an IGRA action in which a tribe sued the State of California when negotiations for a class III tribal-state gaming compact failed.  *See id.* at 1036–37.  Relying on *Carcieri*, the

---

(observing that it is "undisputed that the property was acquired by Bay Mills itself"). Incidentally, the Sixth Circuit's *Bay Mills* decision is pending before the Supreme Court on certiorari review.  The certiorari petition presents two issues for review:  (1) "Whether a federal court has jurisdiction to enjoin activity that violates IGRA but takes place outside of Indian lands; and (2) "[w]hether tribal sovereign immunity bars a state from suing in federal court to enjoin a tribe from violating IGRA outside of Indian lands."  *Michigan v. Bay Mills Indian Cmty.*, No. 12-515, 2012 WL 5353883 (Oct. 23, 2012).  Because this lawsuit does not present a proper challenge to the land-into-trust decisions, the issues in *Bay Mills* do not have direct application here as to Count One.

[21] The Amended Complaint does not assert a claim under the APA; hence, it is not necessary to resolve the parties' Rule 19, *see* Fed. R. Civ. P. 19, and statute-of-limitations arguments.

State argued that it did not have to negotiate with the tribe because the land at issue did "not qualify as 'Indian lands' under IGRA." *Id.* at 1039. The State made its argument nine years into the twenty-first century, notwithstanding the Secretary's decision in 1994 to take the land into trust for the tribe and the State's failure to challenge that decision within the limitations period under the APA. *Id.* at 1035, 1042. The Ninth Circuit agreed with the State, concluding that the State of California did not have to bring a timely action under the APA for a challenge that a final agency decision exceeded statutory authority and that the court could decide whether the Secretary's 1994 decision to acquire the land in trust for the tribe was valid.

The Ninth Circuit recognized that *Carcieri* had not "define[d] what it means for a tribe to be 'under federal jurisdiction'" and that neither party had suggested how the court "should go about deciding whether [the tribe] was a tribe under federal jurisdiction in 1934." *Id.* at 1044. Undeterred by the absence of input from the parties (or the Secretary, who was not a party) and even recognizing that the issue was "perhaps beyond [its] competence to answer," the Ninth Circuit nonetheless tackled the issue in a non-APA action. *Id.* It held that the property at issue did not qualify as "Indian lands" under IGRA because the tribe was not included on the Bureau of Indian Affairs's list prepared shortly after the enactment of the IRA and there were no tribe members living on the land in 1934. *See id.*

42

at 1044–45 (citing 25 U.S.C. § 476 (providing that a central purpose of the IRA was to give "[a]ny Indian tribe, or tribes, residing on the same reservation . . . the right to organize for its common welfare")). "Since no one resided on what is now the rancheria, there was no group to organize. The absence of Big Lagoon from the 258-tribe list was not an intentional or inadvertent omission; it was a reflection of reality." *Id.* at 1045. Accordingly, the Ninth Circuit held that under the Supreme Court's opinion in *Carcieri*, the tribe was not under federal jurisdiction in 1934, so its land, placed into trust by the Secretary in 1994, was not "Indian lands." Accordingly, the tribe could not demand that the State of California engage in negotiations for a class III gaming compact. *Id.* *Big Lagoon* apparently is the only court that has applied *Carcieri*'s holding outside of a challenge to trust status under the APA,[22] and, thus, it is the only case that has permitted what is essentially a collateral challenge to the Secretary's land-into-trust decision.

This court respectfully declines to follow the majority's reasoning in *Big Lagoon*, a non-binding case, as it finds more persuasive *Big Lagoon*'s dissent. The dissent persuasively reasons that *Carcieri* cannot be read as permitting an untimely collateral attack on the Secretary's designation of trust lands. The dissent emphasizes that the Supreme Court decided *Carcieri* in the context of a "timely challenge" to the Secretary's plan to take land into trust for the Narragansett Tribe

---

[22] At least the parties cite no other decision.

43

under the APA:  The *Carcieri* Court "says nothing about a collateral challenge to the legitimacy of a designation of trust property outside the parameters of the [APA]." *Id.* at 1046.  The dissenting judge continues, "Surely it cannot be the case that the State of California can launch a collateral attack upon the designation of trust land years after its administrative and legal remedies have expired." *Id.* (noting APA's six-year statute of limitations).  "*Carcieri* certainly does not come anywhere close to such a holding.  Indeed, we cannot say how the Supreme Court would have ruled if the challenger in *Carcieri* had not filed a timely challenge under the [APA] or had sued under a different statute entirely." *Id.* at 1046–47.  The dissent also observed that *Carcieri* "in no wise . . . purported to address IGRA in any way, or considered an untimely challenge to the designation of trust lands." *Id.* at 1047.  Based upon these distinctions, the dissent parted ways with the majority's holding.

In addition to the points made by the dissent, there are at least five reasons to question *Big Lagoon*'s persuasiveness.  First, *Big Lagoon*'s majority essentially undid a federal agency's final decision and divested that agency's title to land (if not directly, then indirectly), seemingly without concern that the federal agency was not a party to the action.  Second and relatedly, the panel admitted that some of the issues relevant to whether the tribe was under federal jurisdiction in 1934 were "perhaps beyond [its] competence to answer," yet at the same time it failed to

obtain input (as it could have under the APA) from the federal agency that had the specific expertise that the court lacked.  *Cf. United Tribe of Shawnee Indians v. United States*, 253 F.3d 543, 551 (10th Cir. 2001) ("Determining whether a group of Indians exists as a tribe is a matter requiring [ ] specialized agency expertise."). Third, *Big Lagoon* majority's opinion did not acknowledge or apply the Secretary's two-part standard for analyzing "under federal jurisdiction" in the post-*Carcieri* world, *see supra* note 19.  Fourth, the *Big Lagoon* panel essentially conducted a *de novo* review of the Indian-lands status, notwithstanding that a court that reviews a final agency decision "is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry."  *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006).  Fifth, it cannot be ignored that *Big Lagoon* is the subject of a pending petition for rehearing.

### 3.    *Conclusion*

The record contains certified copies of the 1984, 1992, and 1995 deeds for the lands upon which Defendants conduct their gaming activities in Elmore, Escambia, and Montgomery counties, and the deeds reflect that the lands are held in trust by the United States for the benefit of the Poarch Band with the Secretary of the Interior's approval.  In short, these deeds demonstrate that the lands are "held in trust by the United States for the benefit of [the Poarch Band]," as

45

required by § 2703(4)(B).   The State has not demonstrated that the Supreme Court's decision in *Carcieri* opens the door for it to now challenge in Count One the validity of the Secretary's decisions in 1984, 1992, and 1995 to take the lands in Elmore, Escambia, and Montgomery counties into trust for the benefit of the Poarch Band.  The claim in Count One premised on allegedly illegal gaming taking place off Indian lands is due to be dismissed for failure to state a claim upon which relief can be granted.

**D.    Whether the State Can Bring a Public Nuisance Claim Under 18 U.S.C. § 1166 to Enjoin Allegedly Unlawful Class III Gaming (Count Two)**

Count Two alleges a public nuisance law claim under IGRA's penal provision, 18 U.S.C. § 1166.  Section 1166, titled "Gambling in Indian country," prohibits a tribe's operation of class III gaming in the absence of an approved tribal-state gaming compact.  It provides in full as follows:

> (a) Subject to subsection (c), for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State.

> (b) Whoever in Indian country is guilty of any act or omission involving gambling, whether or not conducted or sanctioned by an Indian tribe, which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State in which the act or omission occurred, under the laws governing the licensing, regulation, or prohibition of gambling in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.

(c) For the purpose of this section, the term "gambling" does not include–

(1) class I gaming or class II gaming regulated by the Indian Gaming Regulatory Act, or

(2) class III gaming conducted under a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act that is in effect.

(d) The United States shall have exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal-State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act, or under any other provision of Federal law, has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe.

### 1.   *Parties' Arguments*

Defendants argue that § 1166 does not give the State a federal right of action to obtain an injunction against allegedly illegal non-compacted class III gaming as a public nuisance and that Count Two "fundamentally misconstrues the nature of IGRA and the effect of § 1166." (Doc. # 14, at 9.) They contend that construing § 1166 as extending jurisdiction to states over civil enforcement actions would defeat IGRA's careful balancing of jurisdiction among the tribes, the federal government, and the states and would "subjugate[ ] all of IGRA's limitations on state regulatory and enforcement authority to the Act's penal provision . . . ." (Doc. # 14, at 13.) Defendants assert that their position is consistent with IGRA's

stated purposes,[23] the limited regulatory[24] and enforcement[25] roles IGRA gives states, and IGRA's legislative history.  The upshot of Defendants' argument is that "because Alabama has not entered into a gaming compact with the Tribe, it has no regulatory or enforcement authority over gaming on the Tribe's lands under IGRA."  (Doc. # 14, at 13.)

The State appropriately concedes that it cannot initiate criminal prosecutions based upon § 1166(d).  The State contends, however, that § 1166(d)'s grant of exclusive jurisdiction over criminal prosecutions to the United States amounts to an "unambiguous" proclamation that the United States does not have exclusive jurisdiction "in civil actions like this one."  (Doc. # 17, at 27.)  And the State points out that Alabama law specifically authorizes it to bring a civil-nuisance suit to enjoin illegal gambling.  *See* Ala. Code § 6-5-120 (defining "nuisance"); *Try-Me Bottling Co. v. State*, 178 So. 231 (Ala. 1938) (holding that the state Attorney General had authority to bring suit to enjoin the operation of a lottery as a public

---

[23] *See* § 2702(2)–(3) ("provid[ing] a statutory basis for the regulation of gaming by an Indian tribe" and establishing an "independent Federal regulatory authority [the NIGC] for gaming on Indian lands . . . [and] Federal standards for gaming on Indian lands").

[24] *See* § 2701(5) (giving Indian tribes "the exclusive right to regulate gaming activity on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity").

[25] *See* § 2710(d)(7)(A)(ii) (permitting a state to file suit "to enjoin a class III gaming activity located on Indian lands and conducted in violation of any tribal-state compact").

nuisance).  The State argues, therefore, that § 1166 gives it a right to bring suit to abate the public nuisance of illegal gambling.

### 2.    *Novel Issue*

The parties acknowledge that the Eleventh Circuit has not spoken to whether § 1166 provides a right of action permitting the State to seek an injunction against illegal tribal gaming in Indian country, and the court is not aware that any other circuit has confronted this issue.  The parties, however, cite the Eleventh Circuit's decision in *Florida v. Seminole Tribe of Florida*, 181 F.3d 1237 (11th Cir. 1999), both for what it did and did not decide under IGRA.

In *Seminole Tribe*, the State sued the Seminole Tribe of Florida and its chairman for declaratory and injunctive relief, alleging that they were conducting class III gaming as defined by IGRA without a tribal-state compact.  *See id.* at 1240.  Relevant to the instant case, the chairman sought dismissal on Rule 12(b)(6) grounds that IGRA did not contain an implied right of action "for declaratory or injunctive relief against class III gaming that is being unlawfully conducted without a Tribal-State compact."[26]  *Id.* at 1246.  The Eleventh Circuit

---

[26] In *Seminole Tribe*, the Eleventh Circuit noted that the chairman had not argued under Rule 12(b)(1) that the "Tribe's sovereign immunity shield[ed] him from . . . suit."  *Seminole Tribe*, 181 F.3d at 1245 n.12.  To the contrary, here, the tribal officials urged dismissal on the basis of Rule 12(b)(1), but as found in Part V.B, the Eleventh Circuit's decisions in *Tamiami I* and *II* support a finding that the *Ex parte Young* doctrine provides an exception in this case to tribal sovereign immunity as to the IGRA claim against the tribal officials in their official capacities.  The Rule 12(b)(1) jurisdictional question has been resolved, therefore, in the State of Alabama's favor.  This part addresses under Rule 12(b)(6), whether IGRA gives the State a

agreed.  It held that "the legislative history and statutory scheme of IGRA . . .
unequivocally demonstrate that Congress did not intend to vindicate any such right
[of a state to be "free from class III tribal gaming activities within their borders in
the absence of a compact regulating such activities"] by creating a private right of
action that would allow states to obtain injunctive relief against uncompacted class
III tribal gaming."  *Id.* at 1247.  *Seminole Tribe* forecloses any claim that IGRA
gives the State an *implied* right of action to sue the tribal officials under IGRA to
enjoin them from conducting class III gaming.

      *Seminole Tribe* also contains a footnote upon which both parties rely.  In that
footnote, the Eleventh Circuit observed that "[i]t is unclear whether IGRA
[namely, § 1166] could properly be viewed as giving the State an *express* right to
sue Chairman Billie for injunctive relief."  *Id.* at 1246 n.13.  The court observed
that Florida law permits an action in state court to enjoin a "common nuisance,"
defined to include "slot machines," *id.*, and that the State of Florida had alleged in
its complaint that its action for injunctive relief was appropriate pursuant to
§ 1166.  *Id.*  The court observed that "[a]n examination of cases that have
addressed [§ 1166] engenders some doubt about whether it would permit a state to
bring an action in federal court seeking state-law injunctive relief against a tribe for

cause of action against the tribal officials, and the answer to that question depends upon whether,
as pleaded and argued by the State, § 1166 gives the State a cause of action against the tribal
officials.

violating state gambling laws." *Id.* The Eleventh Circuit "declined to consider" the issue, however, because the State of Florida had not argued in the district court or on appeal for an *express* cause of action under §1166. *Id.* In the end, therefore, the *Seminole Tribe* court concluded that the day for resolution of that issue had not yet come. The State of Alabama contends that today is the day.

### 3. *Statutory Interpretation*

The parties' arguments with respect to whether § 1166 confers a right on the State of Alabama to bring this civil enforcement action against the tribal officials in their official capacities require a walk down the path of statutory interpretation, although the path here is not long. "The question of the existence of a statutory cause of action is, of course, one of statutory construction." *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979). "The starting point for all statutory interpretation is the language of the statute itself." *United States v. DBB, Inc.*, 180 F.3d 1277, 1281 (11th Cir. 1999). If the statute's "'language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case,' and 'the statutory scheme is coherent and consistent,' the inquiry is over." *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997)). "In determining whether a statute is plain or ambiguous, [courts] consider 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *Id.* (quoting

*Robinson*, 519 U.S. at 341).  It also must be kept in mind that "statutes are to be construed liberally in favor of Indians, with ambiguous provisions interpreted to their benefit."  *Hagen v. Utah*, 510 U.S. 399, 437 (1994); *see also Seminole Tribe*, 181 F.3d at 1242 ("[A]mbiguities in federal laws implicating Indian rights must be resolved in the Indians' favor.").

Against this backdrop, the State's argument that § 1166 provides individual states an express right of action to enforce their civil laws against illegal gambling operations on Indian lands finds no support in § 1166's language or context or in the broader context of IGRA as a whole.  To begin, § 1166 does not say anything about states' authority and confers no explicit rights on states.  *See Michigan v. Bay Mills Indian Cmty.*, 695 F.3d 406, 415 (6th Cir. 2012) ("Section 1166(a) itself does not expressly authorize a State to sue anyone, much less an Indian tribe."); *see also Taxpayers of Mich. Against Casinos v. Michigan*, 685 N.W.2d 221, 229 (Mich. 2004) (Section 1166 "does not grant the state regulatory authority over tribal gaming," and it "is not a way to extend the state's power to regulate tribes through the federal government.").  The right that § 1166 expressly creates is the grant to the United States of "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country."  § 1166(d).  Section 1166 does not speak one way or the other about whether a *civil* enforcement action is permissible under its provisions and if

so, who may bring it.  The language and context of § 1166, therefore, do not confer on the State the right it seeks in this case.  The broader context of IGRA leads to the same result.[27]  Namely, no other provision in IGRA provides states any rights under § 1166 or elsewhere to bring civil actions to enjoin illegal gaming on Indian lands.[28]  The path of statutory construction ends, therefore, with the plain and

---

[27]  Section 1166 is part of IGRA's overall scheme.  *See United States v. E.C. Invs., Inc.*, 77 F.3d 327, 330 (9th Cir. 1996) (Section 1166 "was enacted with IGRA in 1988."); (*see also* Doc. # 17, at 25 (pointing out that Defendants "concede that Section 1166 'was a part of the bill that became IGRA and was passed by Congress as a constituent part of the larger Act.'" (quoting Doc. # 14, at 13 n.10)).)

[28]  To be clear, IGRA includes a number of express rights, and some of those go directly to states, but those that go to the states come from tribal-state compacts.  *See, e.g.*, § 2710(d)(7)(A)(ii) (authorizing a state to sue to enjoin a class III gaming activity that is on Indian lands and is conducted in violation of a tribal-state compact); § 2710(d)(7)(A)(iii) (authorizing the Secretary to sue to enforce procedures for conducting class III gaming); § 2711(d) (authorizing a tribe to sue to compel the NIGC Chairman to approve or disapprove a management contract for class II gaming); § 2713(a), (b) (granting the Chairman the right to levy and collect fines against the tribal operator of an Indian game or to issue orders of temporary closure for violations of specified regulations and IGRA and providing a right to a hearing before the NIGC concerning fines imposed or temporary closures ordered by the Chairman); §§ 2713(c), 2714 (authorizing an appeal to a federal district court of NIGC fines and permanent closure orders).  These provisions of IGRA demonstrate that Congress carefully allocated regulatory and enforcement authority for tribal gaming among the federal government, the states, and the tribes.  In short, IGRA explicitly gives states an enforcement role, but only through agreed-upon terms negotiated between the state and the tribe and embodied in the tribal-state compact, "the centerpiece of the IGRA's regulation of class III gaming."  *Mashantucket Pequot Tribe v. Connecticut*, 913 F.2d 1024, 1031 (2d Cir. 1990).  Section 1166(d) also is consistent with the notion that states must acquire their enforcement authority over gaming on Indian lands through tribal-state compacts.  *See* § 1166(d) (providing that criminal jurisdiction may be transferred from the United States to a state if a tribal-state compact entered into IGRA so provides).

In fact, a number of courts have recognized the tribal-state compact restriction on states' enforcement authority.  *See Cabazon Band of Mission Indians v. Wilson*, 124 F.3d 1050, 1059 (9th Cir. 1997) ("Outside the express provisions of a compact, the enforcement of IGRA's prohibitions on class III gaming remains the exclusive province of the federal government."); *Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 690 (1st Cir. 1994) (observing "that the very structure of [IGRA] forbids the assertion of state civil or criminal jurisdiction over class III

unambiguous language of § 1166 demonstrating that Congress has not provided a right of action under § 1166 for the State to bring this civil action.

While the analysis should be over, the State makes three arguments urging a contrary conclusion.  First, the State contends that § 1166(a) "*expressly* requires Indian casinos to comply with state laws 'pertaining to the licensing, regulation or prohibition of gambling.'"  (Doc. # 17, at 24 (emphasis added).)   That much is true.  Section 1166(a), by its express terms, incorporates state law "for purposes of federal law" such that state law in effect becomes federal law.  That language does not *expressly* give a state jurisdiction to enforce any civil remedies under its state laws; it says nothing about state jurisdiction at all.  *See Touche Ross & Co.*, 442 U.S. at 568 ("[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." (citation and internal quotation marks omitted)).

gaming except when the tribe and the state have negotiated a compact that permits state intervention"); *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170, 1177 (10th Cir. 1991) (describing IGRA, in particular § 1166(d) as preempting state criminal jurisdiction and a congressional limitation of "the states' enforcement role to class III gaming conducted under a compact"); *Wyandotte Nation v. Sebelius*, 337 F. Supp. 2d 1253, 1257 (D. Kan. 2004) ("Although the IGRA provides that Class III gaming activities are only lawful if conducted in conformance with a tribal-state compact, it does not follow that the states have any authority to regulate Class III gaming in the absence of a compact.  States may not enforce the terms of IGRA – the only enforcement provided for in the IGRA is through the federal government."), *vacated and remanded on other grounds*, 443 F.3d 1247 (10th Cir. 2006); *see also* Kurtis A. Kemper, J.D., Annotation, Preemption of State Law by Indian Gaming Regulatory Act, 27 A.L.R. Fed. 2d 93 (2008) ("The tribal-state compacts are at the core of the scheme Congress developed to balance the interests of the federal government, the states, and the tribes" and provide "[t]he only avenue for significant state involvement in Indian gaming under the IGRA.").

Second, the State contends that there is out-of-circuit authority to buttress its position that "[b]y incorporating all state laws 'not limited to criminal sanctions,' Section 1166 authorizes the filing of public-nuisance suits to enjoin unlawful class III gambling on Indian lands, where those suits are recognized by applicable state law." (Doc. # 17, at 25 (citing *United States v. Santee Sioux Tribe of Neb.*, 135 F.3d 558 (8th Cir. 1998), and *United States v. Seminole Tribe of Fla.*, 45 F. Supp. 2d 1330 (M.D. Fla. 1999).)   The State then makes an inferential leap that, "[b]ecause Alabama law indisputably provides a cause of action through which the State can enjoin unlawful gambling as a public nuisance, *the State* can file that cause of action to enjoin illegal gambling on Indian Lands as well." (Doc. # 17, at 27 (emphasis added).)

The leap – that § 1166's incorporation of state laws simultaneously gives the State *civil* enforcement authority under § 1166 – is not one that either *Santee Sioux* or *Seminole Tribe* makes.   In those decisions, the courts concluded that § 1166 permits public-nuisance *civil* actions to enjoin unlawful tribal gambling, but in both cases, it was the federal government, not a state, that commenced the actions, and the State was not a party to the lawsuit.[29]   Neither *Santee Sioux* nor *Seminole*

_____

[29] There is conflicting authority, but it cuts against the arguments of the State.  *See United States v. Santa Ynez Band of Chumash Mission Indians of the Santa Ynez Reservation*, 983 F. Supp. 1317, 1325 (C.D. Calif. 1997) ("suggest[ing] that § 1166(a) provides no basis for civil enforcement by anyone" and concluding that Ninth Circuit precedent foreclosed state enforcement); *Sycuan Band of Mission Indians v. Roache,* 788 F. Supp. 1498, 1506–07 (S.D. Cal. 1992), *aff'd*, 54 F.3d 535 (9th Cir. 1994) (observing that in § 1166(a), "Congress federalized

*Tribe* addressed a state's authority to bring a civil action under § 1166.  *See Sycuan Band of Mission Indians*, 788 F. Supp. at 1506 (Section 1166(a)'s "incorporation of state law . . . does not necessarily indicate that Congress intended to grant concurrent jurisdiction to the states to enforce the new federal rights.").

Moreover, the courts' rationales for permitting the United States to institute the civil enforcement actions in *Seminole Tribe* and *Santee Sioux* do not transfer to the issue of the authority of the states.  In *Santee Sioux*, the Eighth Circuit held that, given IGRA's silence "with respect to the authority to conduct litigation necessary to enforce the NIGC's closure orders," Congress must have intended for the United States Attorney General to enforce NIGC orders in federal court pursuant 28 U.S.C. § 516, which gives the Attorney General "plenary power over litigation" in which the United States has an interest.  *See* 135 F.3d at 562.  Similarly, in *Seminole Tribe*, the court found that the United States had authority to seek civil injunctive relief based on § 1166(a), in conjunction with the "presumption against a congressional intent to limit the power of the Attorney General to prosecute offenses under the criminal laws of the United States."  45 F. Supp. 2d at 1331.  *But see Seminole Tribe*, 181 F.3d at 1244 n.10 (noting the district court's finding in *Seminole Tribe* that the Attorney General had authority to seek civil injunctive relief, but "express[ing] no opinion on [its] correctness"

---

state law" and concluding that "a state may exercise jurisdiction over Indian gaming only by entering into a compact with the tribe").

(citing *Seminole Tribe*, 45 F. Supp. 2d at 1331)).  Neither this presumption nor §

516 has any bearing on a state's authority under § 1166, and these decisions do not

help the State of Alabama in its pursuit of a right of action.

Third, the State of Alabama pushes an alternative argument that, "even if the

text of Section 1166 were ambiguous" (Doc. # 17, at 28), a right of action in

§ 1166 exists by way of a canon of statutory interpretation – *expressio unius est*

*exclusio alterius* – which means "the mention of one thing implies the exclusion of

another."  *United States v. Castro*, 837 F.2d 441, 442 (11th Cir. 1998).  The State's

argument is that "Congress necessarily implied that the United States would *not*

have 'exclusive jurisdiction' to bring other kinds of state-law actions incorporated

into federal law by Section 1166."  (Doc. # 17, at 28.)  However, as the Eleventh

Circuit observed in *Castro*, "[a] discussion of the *expressio unius* idea is always

necessarily accompanied by a discussion of its limitations," suggesting "that it is

perhaps a rule honored more in the breach than in the observance."  837 F.3d

at 443 n.2.  In particular, the canon "cannot apply when the legislative history and

context are contrary to such a reading of the statute."  *Id.* at 442–43.  While resort

to the legislative history is not required or necessary here[30] – to reiterate, the plain

---

[30] *See DBB, Inc.*, 180 F.3d at 1281 ("We will only look beyond the plain language of a
statute at extrinsic materials to determine the congressional intent if:  (1) the statute's language is
ambiguous;  (2) applying it according to its plain meaning would lead to an absurd result; or
(3) there is clear evidence of contrary legislative intent."); *see also CBS Inc. v. PrimeTime 24
Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) ("When the import of the words Congress
has used is clear . . . [,] we need not resort to legislative history, and we certainly should not do

language of § 1166 does not give the State of Alabama a right of action to bring Count Two – IGRA's legislative history nonetheless refutes the State's argument. There is no indication in the legislative history that a state's authority in the tribal lands gaming arena might be garnered outside of the tribal-state compact. *See* S. Rep. No. 100–446 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3075 (Under IGRA, "unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands [through a tribal-state compact], the Congress will not unilaterally impose or allow State jurisdiction on Indian lands for the regulation of Indian gaming activities," and "[i]n no instance, does [IGRA] contemplate the extension of State jurisdiction or the application of State laws for any other purpose."). Hence, if it were necessary to look beyond the plain language of § 1166, the legislative history would foreclose the State's alternative argument that relies on the *expressio unius* rule.[31]

In sum, the State of Alabama has not demonstrated that § 1166 provides it with a right of action to bring this civil enforcement action to enjoin allegedly

---

so to undermine the plain meaning of the statutory language." (internal quotation marks and citation omitted)).

[31] It may be significant that Congress made the above-quoted observation; it may be more significant that Congress chose not to express its content in IGRA. Certainly, there is no rule of logic or construction that requires one to automatically ascribe left-out thoughts and phrases as legally adopted legislative offspring. The opposite conclusion is more logical – the thought was, in the end, rejected – an entirely different legislative intent. The logical inference is the thought did not belong in the law. But legislative history is only cited here to show the weakness in the *expressio unius* canon argument.

illegal tribal gaming occurring at the Poarch Band casinos.  Congress has spoken clearly on this issue, and courts cannot create a federal statutory cause of action where one does not exist, "no matter how desirable that might be as a policy matter," because only Congress can make that decision. *Alexander v. Sandoval*, 532 U.S. 275, 286–87 (2001); *cf. Gaming Corp.*, 88 F.3d at 547 ("Although courts may be reluctant to conclude that Congress intended plaintiffs to be left without recourse, the intent of Congress is what controls." (internal citation omitted).  The bottom line is that even if Defendants are operating illegal class III gaming at the Poarch Band casinos, § 1166 does not provide the State authority to prohibit such gaming.  Accordingly, Count Two is due to be dismissed for failure to state a claim upon which relief can be granted

## VI. CONCLUSION

Based upon the foregoing, it is ORDERED that Defendants' motion to dismiss is GRANTED as follows:

(1)    The motion is GRANTED for lack of subject-matter jurisdiction as to the state-law claim in Count One that pertains to the governance of gaming on Indian lands on the basis that IGRA completely preempts it and, alternatively, the motion is GRANTED as to this state-law claim against the individual Defendants in their official capacities on the basis of tribal sovereign immunity;

(2)     The motion is GRANTED for failure to state a claim upon which relief can be granted as to the state-law claim in Count One that pertains to the governance of gaming allegedly occurring off Indian lands on the basis that the claim is an impermissible collateral challenge to the Secretary of Interior's decades-old land-into-trust decisions;

(3)     The motion is GRANTED for lack of subject-matter jurisdiction as to all claims against PCI Gaming Authority on the basis of tribal sovereign immunity; and

(4)     While the federal-law claim in Count Two against the individual Defendants in their official capacities survives the jurisdictional attack on the basis of *Ex parte Young*, the motion is GRANTED for failure to state a claim upon which relief can be granted on the basis that 18 U.S.C. § 1166 does not give the State of Alabama authority to bring this civil enforcement action.

DONE this 10th day of April, 2014.

_____/s/ W. Keith Watkins_____
CHIEF UNITED STATES DISTRICT JUDGE